**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**MICHAEL L. SCULLY,**

                              **Plaintiff,**

    **-against-**                                    **7:03-CV-846**


**CITY OF WATERTOWN, New York;**
**THE CITY OF WATERTOWN POLICE DEPARTMENT;**
**POLICE OFFICER ROY WHITMORE, City**
**of Watertown Police Department; POLICE**
**OFFICER JOSEPH C. REFF, City of Watertown**
**Police Department; and ROBERT PICHE,**
**Chief of Police, City of Watertown**
**Police Department,**

                              **Defendants.**
_____

**APPEARANCES:**                                **OF COUNSEL:**

LAW OFFICE OF DANIEL A. EHRING        DANIEL A. EHRING, ESQ.
*Attorney for Plaintiff*
274 Delaware Avenue
Delmar, New York 12054

SLYE & BURROWS                        CHRISTINA E. STONE, ESQ.
*Attorneys for Defendant Piche and*
*the City of Watertown Defendants*
104 Washington Street
Watertown, New York 13601

CONBOY, MCKAY, BACHMAN & KENDALL, LLP   STEPHEN W. GEBO, ESQ.
*Attorneys for Defendants Whitmore*
*and Reff*
407 Sherman Street
Watertown, New York 13601-9990

**THOMAS J. McAVOY,**
**Senior United States District Judge**

1

**MEMORANDUM, DECISION & ORDER**

## I. INTRODUCTION

Plaintiff commenced this action on July 8, 2003 pursuant to 42 U.S.C. §§ 1983, 1985, and 1988 and New York State common law, asserting claims arising out of his arrests and prosecutions by defendants.  On January 8, 2004, the Court dismissed all claims brought pursuant to state common law. See Decision and Order, dkt. # 23.  Presently before the Court are two motions for summary judgment: the first by the City of Watertown, the City of Watertown Police Department, and Police Chief Robert Piche; and the second by Officers Roy Whitmore and Joseph C. Reff.  Together, the motions seek to dismiss the remainder of the claims in this case. Plaintiff has opposed the motion.  For the reasons that follow, both motions are granted and the action is dismissed.

## II. STANDARD FOR SUMMARY JUDGMENT

It is well settled that on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in his favor. Abramson v. Pataki, 278 F.3d 93, 101 (2d Cir. 2002); Tenenbaum v. Williams, 193 F.3d 581, 593 (2d Cir. 1999).  The Court may grant summary judgment only where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).  An issue is genuine if the relevant evidence is such that a reasonable jury could return a

2

verdict for the nonmoving party. <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242, 248 (1986).  A party seeking summary judgment bears the burden of informing the court of the basis for the motion and of identifying those portions of the record that the moving party believes demonstrate the absence of a genuine issue of material fact as to a dispositive issue. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).

If the movant is able to establish a *prima facie* basis for summary judgment, the burden of production shifts to the party opposing summary judgment who must produce evidence establishing the existence of a factual dispute that a reasonable jury could resolve in his favor. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).  A party opposing a properly supported motion for summary judgment may not rest upon "mere allegations or denials" asserted in his pleadings, <u>Rexnord Holdings, Inc. v. Bidermann</u>, 21 F.3d 522, 525-26 (2d Cir. 1994), or on conclusory allegations or unsubstantiated speculation. <u>Scotto v. Almenas</u>, 143 F.3d 105, 114 (2d Cir. 1998).  A Plaintiff may not create a question of fact by submitting an affidavit that contradicts his prior sworn testimony, <u>Hayes v. New York City Department of Corrections</u>, 84 F.3d 614, 619 (2d Cir. 1996), and hearsay evidence that would not be admissible at trial is not competent material for a Rule 56 affidavit. <u>Sarno v. Douglas Elliman- Gibbons & Ives, Inc.</u>, 183 F.3d 155, 160 (2d Cir. 1999).

3

On a motion for summary judgment, it is the duty of the attorneys, not the Court, to sift through the record and bring to the Court's attention the pertinent information that may create a triable issue of fact. See Amnesty America v. Town of West Hartford, 288 F.3d 467, 470 (2d Cir. 2002)("We agree with those circuits that have held that FED. R. CIV. P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.")(citations omitted). In this regard, the Court's Local Rules require the parties "to clarify the elements of the substantive law which remain at issue because they turn on contested facts" and the Court "is not required to consider what the parties fail to point out." Monahan v. New York City Dep't of Corrections, 214 F.3d 275, 291 (2d Cir. 2000)(internal quotation marks and citations omitted). Specifically, the Local Rules require a party moving for summary judgment to submit a "Statement of Material Facts" which

> shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established. The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits. It does not, however, include attorney's affidavits.

N.D.N.Y.L.R. 7.1(a)(3).

Once such a statement is submitted, the party opposing summary judgment

> shall file a response to the [movant's] Statement of

4

Material Facts. The non-movant's response shall mirror
the movant's Statement of Material Facts by admitting
and/or denying each of the movant's assertions in
matching numbered paragraphs. Each denial shall set forth
a specific citation to the record where the factual issue
arises. The non-movant's response may also set forth any
additional material facts that the non-movant contends
are in dispute in separately numbered paragraphs. <u>Any
facts set forth in the Statement of Material Facts shall
be deemed admitted unless specifically controverted by
the opposing party</u>.

<u>Id.</u> (emphasis in original).

Plaintiff's submissions in opposition to the pending motions
evince either a misunderstanding of, or a disregard for, the above-
referenced requirements.  Plaintiff's "Statement of Material Facts"
[dkt. # 52] neither mirrors the defendants' Statements of Material
Facts, nor contains any citations to record evidence. Counsel's
affirmation in opposition [dkt. # 55] attaches a trial transcript
as an exhibit [dkt. # 56], but provides no citations to particular
portions thereof.  While Plaintiff does provide an affidavit [dkt.
# 53], it contains no citations to the record and, in many places,
relies upon inadmissible hearsay, surmise, speculation, or
unsupported conclusions. To the extent the assertions in
Plaintiff's affidavit are based upon personal knowledge and do not
amount to surmise, speculation or unsupported conclusory
allegations, it is considered in opposition to the defendants'
Statements of Material Facts. In all other regards, the properly
supported allegations in the defendants' Statements of Material

5

Facts are deemed admitted for purposes of this motion.[1]

N.D.N.Y.L.R. 7.1(a)(3); <u>Gubitosi v. Kapica</u>, 154 F.3d 30, 31 n. 1

(2d Cir. 1998)(*per curiam*)(accepting as true material facts

contained in unopposed local rule statement of material facts).

With these parameters in mind, the Court turns to the facts, viewed

in the light most favorable to the Plaintiff, that are supported by

the record.

## III.   FACTS

Plaintiff asserts that due to a strained relationship between

his sister and Defendant Reff that ended in 1995,[2] the defendant

police officers engaged in a series of unconstitutional actions

against him, conspired to violate his civil rights, and that the

City failed to properly train or supervise its officers thereby

subjecting him to constitutional violations.  In this regard,

Plaintiff asserts that "in the spring or summer of 2000," Defendant

Reff, an Officer with the Watertown Police Department, "pulled

[him] over ... for no apparent reason." <u>Id.</u> ¶ 11. Plaintiff claims

---

[1] Some of the facts asserted in the defendants' Statement of Material Facts are unsupported by competent evidence and, to this extent, are ignored.

[2] In 1994, Defendant Reff dated Plaintiff's sister. Reff Aff. ¶ 7(A).  During the period that the two dated, Reff would regularly come to the home that Plaintiff and his sister shared with Plaintiff's mother. Scully Aff. ¶ 5.  Reff and Plaintiff became acquainted during this period. Scully Aff. ¶ 5.  The relationship between Reff and Plaintiff's sister ended and, on March 9, 1995, the two had a confrontation in a supermarket while Reff was with his then-current girlfriend (now his wife). Reff Aff. ¶ 7(B)-(C).  Reff filed a criminal complaint against Plaintiff's sister alleging that she was harassing him, but indicated that he did not want Plaintiff's sister to be arrested. <u>Id.</u>  Plaintiff moved to California "thereafter," and then moved back to Watertown "in 1999 or 2000, residing at [his] mother's home at 324 Central Street" in Watertown. Scully Aff. ¶ 10. Plaintiff testified at his deposition that, other than the failed relationship between his sister and Reff, he could think of no other reason that motivated defendants' actions that are the focus of this case. Scully Dep., p. 70.

that on this unspecified date, Reff searched his car, asked him if the radio in the back seat was stolen, and required him to submit to "an alco-check, a mini-breathalyzer type of machine or equipment." Id. ¶¶ 12-13.  However, "[n]o tickets were issued." Id. ¶ 11.

Plaintiff also contends that "sometime in the summer[] 2000," he was stopped again by Reff and instructed to submit to another alco-check." Scully Aff. ¶¶ 15-18. Again, no tickets were issued. Id. ¶ 19. Plaintiff further contends that "[o]n numerous occasions, defendant Reff would stop [him] in the parking lot of different bars, [and] follow [him] after [he] left bars and/or restaurants." Id. ¶ 20.

At unspecified times prior to March 31, 2001, Plaintiff made "2 or 3 calls" to the City of Watertown Police Department to complain of "the harassment [he] was receiving from defendant officer Reff." Scully Aff. ¶¶ 27-30.  On the "second or third" of these call, Plaintiff spoke directly with Chief Piche, explained the situation, and was then transferred to an unnamed City of Watertown Police Department detective. Id.  ¶¶ 31-34. Plaintiff purportedly explained the situation to the detective, and was told by the detective that someone would "talk to" Defendant Reff. Id. ¶ 37.  Plaintiff also wrote a letter to Chief Piche "detailing [his]

complaints regarding the harassment." <u>Id.</u> ¶ 39.[3]

On March 31, 2001 at approximately 3:00 a.m., Defendant Whitmore, an Officer with the Watertown Police Department, was on duty as a road patrol officer in a marked patrol car. Whitmore Aff., ¶ 5(C). Whitmore observed a white Kia vehicle abruptly swerve into the wrong lane on State Street in the City of Watertown, travel down the wrong lane, swerve back into its own lane, and then make a U-turn to travel in the opposite direction. Whitmore Aff. ¶ 5(D)-(E). Whitmore activated his emergency lights and attempted to stop the vehicle for the illegal lane change. Whitmore Aff. ¶ 5(F). The vehicle did not stop but instead turned onto North Hamilton Street and then onto Remington Street, pulled into the last driveway on the left side of Remington Street, and then the driver exited the vehicle and fled on foot. <u>Id.</u> ¶ 5(G). Whitmore observed the driver, a white male with dark hair wearing a dark peacoat, jump a fence and head south toward Bronson Street. <u>Id.</u> at ¶ 5(H). Whitmore radioed in a request for assistance in apprehending the fleeing suspect, giving a description of the suspect. <u>Id.</u> ¶ 5(I); Reff Aff. ¶ 5(G); IDSOF ¶ 9. Several on-duty officers, including Reff, responded to the call for assistance. <u>See</u> <u>e.g.</u> Wood Aff. ¶¶ 3-5; Romano Aff. ¶¶ 3-5; Keck Aff. ¶¶ 3-5; Reff

---

[3] Defendant Reff asserts that he had no contact with Plaintiff from 1994 until Plaintiff was arrested by Defendant Whitmore on March 31, 2001. Reff Aff. ¶ 7(D). The City of Watertown has no record of any telephone call or letter from Plaintiff, City Defs. Stat. of Facts [dkt. #47(3)]("CDSOF") ¶¶ 10-11, and it appears from the record that Chief Piche is now deceased.

Aff. ¶¶ 5(B)-(G).

Plaintiff concedes that on March 31, 2001, after being out in bars with friends (drinking a few alcoholic beverages before 8:00 p.m. but only soda or water thereafter) and being dropped off at his mother's house a little before 3:00 a.m.,[4] he left the house in his mother's white Kia automobile to purchase bottled water. Scully Aff. ¶¶ 49-56; Trial Trans. p. 151. He drove down State Street and, seeing that the store he was traveling to was closed, made a U-turn in the Colonial Laundromat. Scully Aff. ¶ 56. Plaintiff then returned to his mother's house at 324 Central Street, parked the car, and began walking to the A-Plus store located on the lower end of State Street to purchase the bottled water. Scully Aff. ¶¶ 10, 54-57. Plaintiff never witnessed any police car following him with its lights on. Id. ¶ 58. As a "short cut to Central Street," Plaintiff walked through his yard and his neighbor's yard. Id. ¶ 62.[5] Plaintiff "was planning on walking south on Central Street to State Street, then west on State Street to the A-Plus mini-mart." Id. ¶ 64. "However, when [Plaintiff] got on Central Street [he] observed defendant officer Reff standing on the corner, about a block from [his] mother's house." Id. ¶ 65. "Not wanting to have another run-in with defendant officer Reff,

---

[4] Plaintiff does not assert the time he was dropped off at his mother's house but, given his rendition of the events that occurred thereafter, there can be no dispute that it occurred close to 3:00 a.m.

[5] It is unclear why Plaintiff would need to take a short cut to get to Central Street if his mother's house was located on Central Street.

[Plaintiff] tried to avoid him by cutting behind a house onto a neighbor's property." Id. ¶ 66.

Reff saw Plaintiff and told him to stop. Id. ¶¶ 67-68. Plaintiff complied and took off his coat "to demonstrate [he] didn't have any weapons or anything." Id. Reff approached Plaintiff, handcuffed him, and waited for Whitmore to arrive. Id. ¶¶ 70-71. While he was waiting for Whitmore, Reff noticed a strong odor of alcohol coming from Plaintiff. Reff Aff. ¶ 5(L).

Whitmore found Reff and Plaintiff located behind a house at 916 Bronson Street. Whitmore Aff. ¶ 5(M). Whitmore identified Plaintiff as the driver of the white Kia vehicle he had been pursuing. Id. ¶ 5(K). Prior to this time, Plaintiff and Whitmore did not know one another. Ind. Defs. Stat. of Facts [dkt. # 48(27)]("IDSOF") ¶ 24; Whitmore Aff. ¶ 5(L). Whitmore observed that Plaintiff had taken off his coat, and noticed (a) an odor of an alcoholic beverage coming from Plaintiff, (b) that Plaintiff's speech was slurred, and (c) that Plaintiff had red, glassy eyes. Whitmore Aff. ¶ 5(N). Whitmore determined to conduct field sobriety tests. After explaining and/or demonstrating the field sobriety tests for Plaintiff, and determining that Plaintiff had no physical ailments that would have prevented him from performing the tests, Whitmore administered three field sobriety tests - the horizontal gaze nystagmus test; the one-leg stand test; and an Alco-sensor test. Id. ¶¶ 5(O)-(T)

On the horizontal gaze nystagmus test, Plaintiff "showed lack of smooth pursuit in both eyes along with noticeable nystagmus at max deviation on both the furthest extents and in both eyes at an angle of onset of nystagmus prior to 45 degrees, indicating to [Whitmore] that [Plaintiff] was under the influence of alcohol." Id. ¶ 5(P). On the one-leg stand test, Plaintiff

> initially failed to follow instructions, in that he started out with his foot on the ground and was not counting out loud. When I advised Scully that he was not performing the test correctly, he did begin to follow the instructions, but then Scully had to pick up his arms and he was hopping around on his down foot in order to maintain his balance. Scully failed the one-leg stand test, indicating to me that he was under the influence of alcohol.

Id. ¶¶ 5(Q)-(S).  Finally, the Alco-sensor test "showed positive for the presence of alcohol in Scully's system." Id. ¶ 5(T). Plaintiff does not refute any of the factual allegations made by Whitmore regarding these tests, but asserts only that "in my opinion, I passed since I had not consumed any alcohol [in] six (6) or (7) hours." Scully Aff. ¶ 72.

After conducting the test, Whitmore "formed an opinion based upon [his] professional experience that Scully was intoxicated in the early morning hours of March 31, 2001."  Whitmore Aff. ¶ 5(U). Based upon these facts, and upon the fact that Whitmore had observed Plaintiff driving a motor vehicle erratically only minutes before, Whitmore formed the further opinion that he had probable cause to arrest Plaintiff for Driving While Intoxicated ("DWI") in

11

violation of New York Vehicle and Traffic Law ("VTL") § 1192(3), and to ticket him for failure to keep right in violation of VTL 1120(a) and failure to comply with an emergency vehicle in violation of VTL 1102. Id. ¶ 5(V); see also IDSOF ¶¶ 1-2.

Whitmore then transported Plaintiff to the Police Station. Scully Aff. ¶ 73. At the station, Plaintiff advised Whitmore that he had consumed a couple of beers that night but that the keys he had did not operate the white Kia vehicle that Whitmore had followed. Whitmore Aff. ¶ 6(A). Whitmore instructed Plaintiff to submit to a Datamaster test, which is a machine that measures a person's blood alcohol content (BAC). Whitmore Aff. ¶ 6(C). At first Plaintiff refused to blow into the machine, id. ¶ 6(D) and, at 3:53 a.m., Whitmore read to Plaintiff what is known as the "DWI Refusal Warning" along with Miranda Warnings. Whitmore Aff. ¶ 6(E). Plaintiff contends that he did not blow into the machine initially because his handcuffs were too tight and that he had asked to have them removed before he took the test. Scully Aff. ¶¶ 75-76. Whitmore refused this request based upon departmental policy that prohibited the removal of handcuffs before the Datamaster test was administered so as to insure that the testee did not put something into his mouth that would jeopardize the test results. Whitmore Aff. ¶ 6(J). Whitmore advised Plaintiff that he would remove the handcuffs after Plaintiff submitted to the test. Id. ¶ 6(K); Scully Aff. ¶ 77.

At 4:02 a.m., Plaintiff agreed to blow into the machine but, according to Whitmore, Plaintiff "merely put his mouth on the tube and did not blow." Whitmore Aff. ¶ 6(G). The attempt was "deemed a refusal by the machine." Id. ¶ 6(H). Plaintiff asserts that he did blow into the machine and that Whitmore said that the machine did not work properly and needed to be re-calibrated. Scully Aff. ¶¶ 79, 82-84.[6] Either way, there is no dispute that the first test did not yield a BAC reading and that Plaintiff refused all further direction for submission to the test. See Id. ¶ 80; Whitmore Aff. ¶ 6(I). Whitmore also asked Reff to take the keys that were in Plaintiff's possession and to see if they started the white Kia vehicle that Whitmore had followed. Whitmore Aff. ¶ 6(B). Reff did so and found that the keys started the vehicle. Reff Aff. ¶ 5(Q).

Plaintiff was placed in a holding cell and arraigned before a judge in the Watertown Town Court the following morning. Scully Aff. ¶¶ 85-86. Based upon Whitmore's representation that Plaintiff refused to submit to the Datamaster test, the judge took Plaintiff's license and suspended his privileges to operate a motor vehicle in New York pending a "DWI refusal hearing." Id. ¶¶ 87-88. The DWI refusal hearing was scheduled for "sometime" in April 2001. Id. ¶ 88. Whitmore did not appear at the scheduled hearing so the administrative law judge re-instated Plaintiff's driving privileges

---

[6] Defendant Whitmore asserts that the Datamaster machine was working properly on March 31, 2002, and that the machine's operations checklist shows that he properly administered the test on Plaintiff. See Whitmore Aff. ¶¶ 6(L)-(M).

pending a second DWI refusal hearing. Id. ¶ 89. The second DWI refusal hearing took place "in June 2001," and, apparently, the administrative law judge reserved decision at the hearing and allowed Plaintiff to maintain his driving privileges unless the administrative law judge ultimately determined to revoke or suspend the privileges. See id. ¶¶ 90-93.  Also "in June of 2001," Plaintiff was indicated by a grand jury on charges of felony DWI. See IDSOF ¶ 3; CDSOF ¶ 4; Scully Aff. ¶ 105.[7]

On July 11, 2001 at about 2:20 a.m., Reff was on patrol in the City of Watertown when he observed Plaintiff drive past him in a small grey Dodge vehicle. Reff. Aff., Ex D (Support Dep.).  Reff followed Plaintiff and

> asked dispatch to check on his license status in N.Y.S. I asked for this check because being familiar w/ [Plaintiff], I knew that his license either was or is about to be suspended or revoked since he refused a chemical test in a previous DWI arrest and a DMV license suspension hearing was held.

Id.  Reff was informed by dispatch that Plaintiff's license had been revoked the day before, July 10, 2001, for a DWI chemical test refusal. Id.  At the time, Plaintiff's license had actually been suspended, see IDSOF § 21; Trial Trans. p. 153 [dkt. # 56(13)], although Plaintiff was unaware of the suspension. Trial Trans. p. 153. Reff then pulled Plaintiff over and issued him a ticket for

---

[7] The defendants' Statements of Material Facts simply state, without evidentiary support, that Plaintiff was indicated by a grand jury for felony DWI in June of 2001.  These unsupported assertion, in and of themselves, would be of no legal consequence on this motion except for the fact that Plaintiff has conceded that the defendants testified before a grand jury and that he was tried on a felony charge of DWI. See Scully Aff. ¶¶ 102-105. Therefore, the Court will presume that Plaintiff was, in fact, indicted by a grand jury for felony DWI.

Aggravated Unlicensed Operation of the Motor Vehicle in the Second Degree ("AUO 2nd") in violation of VTL § 511(2)(a). Reff. Aff., Ex D.  The following day, Plaintiff received notification from the DMV administrative law judge that his driving privileges had been suspended. Scully Aff. ¶ 98.

The AUO 2nd charge was eventually dismissed with the consent of the prosecution because the ticket had been issued before Plaintiff received notification of the suspension. Scully Aff. ¶ 99. Plaintiff was also subsequently acquitted of the felony DWI charge and related tickets. Id. ¶ 104. This action, and the instant motions, followed.

**IV.  DISCUSSION**

Previously, the Court dismissed the Second, Third, and Fourth Causes of Action asserted in the Complaint. See January 8, 2004 Decision and Order, dkt. # 23. The remaining claims sound in: (a) false arrest, malicious prosecution, and conspiracy to commit civil rights violation (the First Cause of Action); and (b) a policy and practice claim against the municipal defendants for failing to train or supervise officers who were committing civil rights violations (the Fifth Cause of Action).

**A.  False Arrest and Malicious Prosecution Claims**

**1.  Actionable Arrests**

"[T]he first step [in any section 1983 claim predicated on the Fourth Amendment] is to determine whether there has been a

15

constitutionally cognizable seizure." <u>Medeiros v. O'Connell</u>, 150
F.3d 164, 167 (2d Cir. 1998).  Of course, a Fourth Amendment
violation can occur in circumstances falling short of a formal
arrest. <u>See</u> <u>Terry v. Ohio</u>, 392 U.S. 1 (1968)(Whenever an individual
is physically or constructively detained by a police officer in
such a manner that a reasonable person would not feel he is free to
leave, that individual has been "seized" or "arrested" within the
meaning of the Fourth Amendment.); <u>Weyant v. Okst</u>, 101 F.3d 845,
852 (2d Cir. 1996)(A cause of action for false arrest will lie
where the plaintiff shows, *inter alia*, "that the defendant
intentionally confined him without his consent and without
justification.").

In the instant case, the First Cause of Action appears to be
addressed only to the March 31, 2001 DWI arrest. <u>See</u> Comp. ¶¶ 16-30
(factual allegation addressing only the March 31, 2001 arrest); ¶¶
31-44 (allegations of the First Cause of Action asserting claims
for false arrest, malicious prosecution, and conspiracy surrounding
the March 31, 2001 arrest and eventual prosecution); <u>see also</u>
Pltf's Mem. L. pp. 8-12 (addressing only the March 31, 2001 arrest
in the context of the false arrest & malicious prosecution claims).
The allegations in the First Cause of Action do not specifically
reference the July 11, 2001 AUO 2nd ticket or any of the vehicle
stops by Reff that occurred prior to March 31, 2001, but it is
alleged in the general factual portion of the Complaint that the

16

defendant officers engaged in "a pattern of harassment and unlawful stops, searches and seizures which ultimately resulted in a false arrest [and] malicious prosecution." Compl. ¶ 15. It is presumed that this allegation of a pattern of harassment is intended to provide a predicate for the conspiracy and/or failure to train or supervise claims. However, without factual specificity as to date, time, and circumstances of an alleged "unlawful stop," the Court (and, ultimately, a fact finder) cannot assess whether a discrete constitutional violation occurred from the stop. Further, the Defendants are deprived of the right to assert a defense that the stop in question was privileged and/or that they are entitled to qualified immunity for their action in stopping the vehicle on the date in question.[8] Accordingly, the Court will consider the allegations of unspecified stops by Reff in the context of Plaintiff's conspiracy and pattern and practice claims, but not as the predicate for discrete false arrest claims.

As to the March 31, 2001 and July 11, 2001 stops, Plaintiff has provided sufficient specificity as to date, time and circumstances to allow a proper analysis. Therefore, the Court will

---

[8] An unlawful seizure does not occur every time a police officer approaches a citizen on the street to engage in consensual discourse, see United States v. Tehrani, 49 F.3d 54, 58 (2d Cir. 1995), or to ask a person to identify herself. See Hiibel v. Sixth Jud. Dist. Ct. of Nevada, Humboldt Cty., -- U.S. --, --, 124 S.Ct. 2451, 2458 (2004)("In the ordinary course a police officer is free to ask a person for identification without implicating the Fourth Amendment."). Further, a police officer may stop and detain an individual to conduct a reasonable inquiry into whether crime is afoot without violating the Fourth Amendment if the officer possesses, at the time of the stop, a reasonable suspicion that criminal activity has occurred or is about to occur. Id.; Illinois v. Wardlow, 528 U.S. 119, 123 (2000); Terry v. Ohio, 392 U.S. 1, 20 (1968). A motorist may permissibly be stopped by a police officer and detained when there is at least articulable and reasonable suspicion that either the vehicle or an occupant has violated some law, such as a provision of New York's Vehicle and Traffic Law. See Delaware v. Prouse, 440 U.S. 648, 663 (1979).

consider the March 31, 2001 and the July 11, 2001 encounters as predicates for discrete false arrest and malicious prosecutions claims. Viewing the evidence in the light most favorable to the Plaintiff, a fact finder could easily conclude that the March 31 and July 11, 2001 police encounters were arrests within the meaning of the Fourth Amendment.

### 2.  Probable Cause -Generally

If probable cause existed for either the March 31, 2001 or July 11, 2001 arrests, a false arrest claim predicated thereon would fail as a matter of law. See Jocks v. Tavernier, 316 F.3d 128, 135 (2d Cir. 2003)("If probable cause existed, [Defendant] as a police officer would be privileged to make an arrest."); Smith v. Edwards, 175 F.3d 99, 105 (2d Cir. 1999)("It is well established that appellant's Section 1983 claims against appellees for false arrest and false imprisonment must fail if the appellee-officers had probable cause to arrest him."); Weyant, 101 F.3d at 852 (probable cause is a complete defense to claims for false arrest). Probable cause exists when officers "have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." Posr v. Court Officer Shield No. 207, 180 F.3d 409, 414 (2d Cir. 1999). "Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the

arresting officer at the time of the arrest." <u>Devenpeck v. Alford</u>, -- U.S. --, --, 125 S.Ct. 588, 593 (2004)(citing <u>Maryland v. Pringle</u>, 540 U.S. 366, 371 (2003); <u>see</u> <u>Ricciuti v. N.Y.C. Transit Auth.</u>, 124 F.3d 123, 128 (2d Cir. 1997)(In evaluating the probable cause determination, the Court "consider[s] the facts available to the officer at the time of the arrest.")(citing <u>Lowth v. Town of Cheektowaga</u>, 82 F.3d 563, 569 (2d Cir. 1996)).

The probable cause inquiry is an objective one and the subjective beliefs or motivations of the arresting officer are irrelevant. <u>Devenpeck</u>, 125 S.Ct. at 593-94; <u>Whren v. United States</u>, 517 U.S. 806, 813 (1996); <u>Martinez v. Simonetti</u>, 202 F.3d 625, 633 (2d Cir. 2000); <u>United State v. Scopo</u>, 19 F.3d 777, 780-82 (2d Cir. 1994), <u>cert. denied</u>, 513 U.S. 877 (1994).  Thus, the "actual motivations of the individual officers involved" in a stop or detention "play no role" in the analysis. <u>Whren</u>, 517 U.S. at 813. Police officers may rely upon information gained from other officers in making their probable cause assessment. <u>See</u> <u>Savino v. City of N.Y.</u>, 331 F.3d 63, 74 (2d Cir. 2003)("The collective knowledge doctrine provides that, for the purpose of determining whether an arresting officer had probable cause to arrest, "'where law enforcement authorities are cooperating in an investigation, ... the knowledge of one is presumed shared by all.'")(quoting <u>Illinois v. Andreas</u>, 463 U.S. 765, 772 n. 5, 103 S.Ct. 3319, 77 L.Ed.2d 1003 (1983)).

"A probable cause determination does not require proof beyond a reasonable doubt; it is the mere probability of criminal activity, based on the totality of the circumstances, that satisfies the Fourth Amendment." Hahn v. County of Otsego, 820 F. Supp. 54, 55 (N.D.N.Y. 1993), aff'd, 52 F.3d 310 (2d Cir. 1995); see Calamia v. City of New York, 879 F.2d 1025, 1032 (2d Cir. 1989)(The existence of probable cause must be determined on the basis of the totality of the circumstances). "[T]he eventual disposition of the criminal charges is irrelevant to the probable cause determination." Hahn, 820 F. Supp. at 55 (citing Pierson v. Ray, 386 U.S. 547, 555 (1967)).

Where the facts surrounding the arrest are uncontroverted, the determination as to whether probable cause existed may be made by the court as a matter of law. Weyant, 101 F.3d at 852. Even where factual disputes exist, a § 1983 claim may fail if the plaintiff's version of events is sufficient to establish probable cause to arrest. Mistretta v. Prokesch, 5 F. Supp.2d 128, 133 (E.D.N.Y. 1998). However, where there are "genuine issues" as to any material facts surrounding the issue of probable cause such that it can be said that the question of probable cause is "predominately factual in nature," the determination should be made by a jury. Murphy v. Lynn, 118 F.3d 938, 947 (2d Cir. 1997), cert. denied, 522 U.S. 1115 (1998).

### 3. March 31, 2001 Arrest

The undisputed facts indicated that on March 31, 2001 at about 3:00 a.m, Reff received a fellow officer's radio request for assistance in apprehending a fleeing suspect. The radio request indicated that a white male with dark hair and a dark peacoat had jumped a fence and was traveling between yards in a residential area of Watertown. Reff positioned himself in a location intended to intercept the fleeing suspect.  Plaintiff was cutting through yards in the very location that the suspect had been spotted. When Plaintiff saw Reff, Plaintiff attempted to avoid him by turning back behind another house. Plaintiff matched the description of the fleeing driver.

Given these undisputed facts, no reasonable jury could conclude that Reff lacked probable cause to detain Plaintiff on March 31, 2001. Whether Reff held personal animosity for Plaintiff is irrelevant. The false arrest claim against Reff arising from the March 31, 2001 arrest is dismissed.

Defendant Whitmore also had probable cause to arrest Plaintiff for DWI on the same date. The uncontradicted facts indicate that at about 3:00 O'clock on the morning of March 31, 2001, Whitmore observed a car driving erratically on the Watertown city streets. After making a U-Turn, which could have been perceived by an objectively reasonable officer as an evasive maneuver, Plaintiff failed to stop his car despite the flashing lights on Whitmore's

21

vehicle.  While Plaintiff might not have seen the police car behind him when he pulled into a driveway and parked the car, there is no dispute that instead of going into his house he started cutting through residential yards.  An objectively reasonable officer in Whitmore's position could have believed that the driver was fleeing to evade the police.  Further, Plaintiff was apprehended in the back yard of a residence only moments after he exited his vehicle and, therefore, it was objectively reasonable to conclude that Plaintiff had not consumed alcohol after leaving his vehicle.

Whitmore positively identified Plaintiff as the driver, and Whitmore and Reff both smelled alcohol on Plaintiff. Whitmore observed that Plaintiff spoke with slurred speech and had red glassy eyes, and Plaintiff has not denied that he smelled of alcohol, spoke with slurred speech, or had red glassy eyes when he was apprehended. Whitmore conducted field sobriety tests and determined that Plaintiff failed all three of the tests. Plaintiff's "opinion" that he passed the field sobriety tests, without some factual contention as to how or why he believes he performed satisfactorily on the tests, amounts to nothing more than mere surmise, speculation, or an unsupported conclusory allegation that is insufficient to overcome the uncontested factual testimony to the contrary. See Bulanov v. Meehan, 2002 WL 181365, at *3 (S.D.N.Y. Feb. 6, 2002)(finding arrested driver's "self-evaluation of his sobriety" insufficient to overcome uncontradicted facts

related to alco-test reading that indicated that diver's BAC was above the legal limit) and *5 ("Plaintiff's conclusory assertion that he passed the field sobriety test would not refute [the arresting officer's] observation that he failed the test.").

Given these undisputed facts, no reasonable jury could conclude that Whitmore lacked probable cause to arrest Plaintiff for DWI on March 11, 2001. See Raymond v. Bunch, 136 F. Supp.2d 71, 79 (N.D.N.Y. 2001)(Hurd, J.)(Probable cause to arrest plaintiff for DWI existed when officer was advised by fellow officers that before seeing plaintiff drive away from a store, plaintiff was staggering, was slurring his speech, was having difficulty pouring a cup of coffee, and smelled of alcohol); Callum v. Marsh, 2005 WL 752213, at * 6 (D. Conn. March 31, 2005);[9] Bulanov, 2002 WL 181365, at *4;[10] People v. Morris, 793 N.Y.S.2d 754, 759 (Crim Ct., N.Y.C. 2005)(officer had probable cause to arrest defendant for operating motor vehicle while intoxicated after seeing defendant's vehicle

---

[9] In Callum v. Marsh, 2005 WL 752213, at * 6, the District Court determined that a Connecticut state trooper had probable cause to arrest a driver for driving under the influence of alcohol or drugs, despite the driver's assertions that she was not drinking and her belief that she had passed some of the field sobriety tests, and despite the trooper's admission that he did not smell alcohol, where the uncontradicted facts indicated: (1) the driver was speeding; (2) it took a significant amount of time for the driver to pull over; (3) the driver's eyes appeared glassy; (4) the driver was coming from a casino; (5) the driver failed to complete the horizontal gaze nystagmus test; (6) the driver wobbled in her vehicle; (7) it took the driver an inordinate amount of time to locate her license, registration and insurance paperwork, and (8) the driver was unable to count backwards from 2,000.

[10] In Bulanov v. Meehan, 2002 WL 181365, at *4, the District Court determined that a police officer had probable cause to charge driver with DWI where: (1) the officer found a car parked alongside the roadway; (2) the officer was informed by the driver that there was an open container of beer in the vehicle; (3) the officer smelled alcohol in the car; (4) the driver admitted to drinking some amount of beer that day; (5) the driver failed several field sobriety tests during which time the officer smelled alcohol on plaintiff's person; (6) an alco-test administered at the scene registered a reading above the legal limit.

veer left and right while approaching bridge toll lane, and observing defendant's slurred speech, bloodshot eyes, emanating odor of alcohol, and staggering gait when he exited his vehicle); see also People v. Ladd, 89 N.Y.2d 893, 896 (1996)(finding "reasonable grounds" to believe defendant had been driving while intoxicated where a driver had consumed alcohol, had driven across the center lane in fog at a high speed, and had collided head-on with another car); Gagliardi v. Dept. of Motor Vehicles, 144 A.D.2d 882, 883-84 (3rd Dept. 1988)(police officer had reasonable grounds to arrest motorist for drunk driving where the officer detected alcohol on the motorist's breath, saw him stagger, and observed that his eyes were glazed after an accident); People v. McClaney, 135 A.D.2d 901, 902-03 (3d Dep't 1987)(finding that "the record clearly indicates that defendant's arrest was based upon probable cause" where he drove his car off the road and into a cornfield and then admitted to the arresting officer that he had been drinking); People v. Hall, 91 A.D.2d 1002, 1002-03 (2d Dep't 1983)(per curiam)(finding that the police had probable cause for arrest where a car was driven off the road and into a tree, the driver smelled of alcohol, and an empty bottle of vodka was found in the car), aff'd, 61 N.Y.2d 834 (N.Y. 1984). Given the existence of probable cause to arrest Plaintiff for DWI, the false arrest claim against

Whitmore is dismissed.[11]

Any discrete false arrest claim against Chief Piche for the March 31, 2001 arrest is also dismissed because (a) the arrest was supported by probable cause, and (b) Plaintiff has proffered no evidence that Chief Piche had any personal involvement in the March 31, 2001 arrest, either directly or as a supervisor. See Mura v. Erie Cty. Sheriff Dept., 2005 WL 615754, at *5 (W.D.N.Y. March 16, 2005)("It is well settled that personal involvement of a defendant is a prerequisite to a finding of liability under § 1983.").

**4.  DWI Prosecution**

The existence of probable cause to prosecute Plaintiff for DWI would defeat any claim for malicious prosecution stemming from the March 31, 2001 arrest. See Rohman v. New York City Transit Auth., 215 F.3d 208, 215 (2d Cir. 2000)(an element of a malicious prosecution claim is that the defendant lacked probable cause to

---

[11] Assuming, *arguendo,* that Plaintiff's opinion regarding his performance on the field sobriety tests is sufficient to create a genuine question of material fact as to whether actual probable cause existed to arrest Plaintiff for DWI, Whitmore is entitled to qualified immunity because arguable probable cause existed for that arrest. "Arguable probable cause exists 'if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met.'" Escalera v. Lunn, 361 F. 3d 737, 743 (2d Cir. 2004)(quoting Golino v. City of New Haven, 950 F. 2d 864, 870 (2d Cir. 1991)). Based upon the totality of the uncontested facts, even without the field sobriety tests, objectively reasonable officers could have disagreed as to whether there was probable cause to arrest Plaintiff for DWI and bring him back to the station for further testing using the Datamaster. See Coons v. Cassabella, 284 F.3d 437, 440-441 (2d Cir. 2002)(Finding that N.Y. state trooper's determination that probable cause existed for a DWI appearance ticket "easily [met] the objectively - reasonable test" where the trooper knew: (1) the driver had been involved in a single-car accident in which he drove his pickup truck off the road and into a telephone pole in the early morning hours; (2) that the driver had consumed at least three beers that evening; and (3) that the driver had consumed no alcohol after the accident); Bulanov, 2002 WL 181365, at *6 (finding that if actual probable cause did not exist, arguable probable cause existed entitling defendant to qualified immunity); Whitton v. Williams, 90 F. Supp.2d 420, 430 (S.D.N.Y. 2000)("Certainly, reasonable officers could disagree as to whether there was probable cause to arrest a driver stopped in the early morning hours who smelled of alcohol and admitted to having had five beers.").

believe the proceeding could succeed). "Probable cause, in the context of malicious prosecution, has also been described as such facts and circumstances as would lead a reasonably prudent person to believe the plaintiff guilty." Boyd v. City of N.Y., 336 F.3d 72, 76 (2d Cir. 2003)(citing Colon v. City of New York, 60 N.Y.2d 78, 82 (1983)).

As indicated above, the Defendants had probable cause to arrest Plaintiff for DWI when they took him into custody on March 31, 2001, and therefore had probable cause to prosecute him for the same crime. Sanchez v. Town of Greece, 2004 WL 1964505, at *3 (W.D.N.Y. Sept. 1, 2004)("[T]he existence of probable cause to arrest is a complete defense to [Plaintiff's] claims for false arrest and malicious prosecution.")(citing Townes v. City of New York, 176 F.3d 138, 149 (2d Cir.), cert. denied, 528 U.S. 964 (1999)). This probable cause determination was further bolstered by Plaintiff's refusal to submit to the Datamaster BAC chemical test, see People v. Davis, 2005 WL 670934, at * 3 (N.Y. Sp. Ct., Bronx Cty., March 17, 2005)("In a drunk driving prosecution, the Vehicle and Traffic Law expressly permits the People to introduce evidence that defendant refused to take a breathalyzer test (or other chemical test for the presence of alcohol in defendant's system).")(citing  VTL § 1194(2)(f));[12] People v. Robles, 180

---

[12] New York Vehicle and Traffic Section 1194(2)(f) states as follows:

(continued...)

Misc.2d 512, 515 (Crim. Ct., Bronx Cty. 1999)("The Vehicle and
Traffic Law permits evidence of defendant's refusal to be admitted
at trial on the theory that such a refusal evinces the defendant's
consciousness of guilt."), and his admission that he had consumed a
few alcoholic drinks earlier in the evening.

> Still further,
>
> [a] presumption of probable cause is created [] by a
> grand jury's indictment.  The presumption is rebuttable,
> and may be overcome by evidence establishing that the
> police witnesses "have not made a complete and full
> statement of facts ... that they have misrepresented or
> falsified evidence ... or otherwise acted in bad faith."
> "If plaintiff is to succeed in his malicious prosecution
> action after he has been indicted, he must establish that
> the indictment was produced by fraud, perjury, the
> suppression of evidence or other police conduct
> undertaken in bad faith."

Boyd, 336 F.3d at 76 (quoting Colon, 60 N.Y.2d at 82-83).

As indicated above, Plaintiff was indicted by a grand jury for
felony DWI. Plaintiff has offered no admissible evidence that the
officers involved in his prosecution committed fraud, perjury,
suppression of evidence, or other police conduct undertaken in bad
faith. Plaintiff merely asserts, in wholly conclusory fashion, that
Whitmore and Reff must have lied before the grand jury because he
was eventually acquitted. See Scully Aff. ¶ 105. However, Plaintiff

---

[12](...continued)

Evidence of a refusal to submit to such chemical test or any portion thereof shall be admissible in
any trial, proceeding or hearing based upon a violation of the provisions of section eleven hundred
ninety-two of this article but only upon a showing that the person was given sufficient warning, in
clear and unequivocal language, of the effect of such refusal and that the person persisted in the
refusal.

neither provides defendants' grand jury testimony, nor points to any specific trial testimony that is purportedly false.  He does not allege that defendants suppressed any exculpatory evidence or otherwise acted in bad faith.

The simple assertion that he was acquitted and therefore the officers must have lied is insufficient to overcome the presumption created by the grand jury's indictment, or the clear existence of probable cause arising from the totality of the circumstances presenting themselves at the time of Plaintiff's arrest. See Lowth, 82 F.3d at 571 ("In order for probable cause to dissipate, the groundless nature of the charges must be made apparent by the discovery of some intervening fact," which may include proof that the police falsified, misrepresented or suppressed evidence during a criminal proceeding.). Therefore, Plaintiff's malicious prosecution claim arising for the March 31, 2001 arrest is, in all respects, dismissed.

### 5.  Probable Cause - July 11, 2001 Arrest & Prosecution

Further, based upon the undisputed facts surrounding the July 11, 2001 arrest, there can be no dispute that Reff had actual probable cause to stop and ticket Plaintiff for AUO 2nd on this date.  These undisputed facts indicate that when Reff saw Plaintiff driving, he contacted the dispatcher to determine whether Plaintiff's driving privileges had been suspended following the March 31, 2001 DWI arrest that Reff participated in. Reff's

28

motivation for calling dispatch to check on Plaintiff's status is irrelevant to the probable cause determination. Reff correctly learned that, at the time of his call to dispatch, Plaintiff's driving privileges had been suspended. There is no evidence tending to establish that Reff had actual knowledge of any defense that Plaintiff might have had to the AUO 2nd charge, see Jocks, 316 F.3d at 135-36, and Reff was not required to explore whether or not Plaintiff had received notification of the suspension. Ricciuti v. N.Y.C. Transit Authority, 124 F.3d 123, 128 (2d Cir. 1997)(Once there is a reasonable basis for believing probable cause exists, "[a] police officer is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest.").

Inasmuch as probable cause existed to stop Plaintiff while driving the vehicle on July 11, 2001 and to issue him a ticket for AUO 2nd, any false arrest claim arising therefrom is dismissed. Further, there is no indication on this record that Reff or any other defendant learned of some fact after the ticket was issued that would have caused probable cause to dissipate, and, therefore, any malicious prosecution claim based upon this ticket is also dismissed.

### B.  Conspiracy Claim

Plaintiff has also failed to marshal evidence to support an actionable conspiracy claim.  "To prove a § 1983 conspiracy, a

29

plaintiff must show: (1) an agreement between two or more state actors ...; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." Pangburn v. Culbertson, 200 F.3d 65, 72 (2d Cir. 1999).  "In order to maintain a[] [conspiracy] action under Section 1985, a plaintiff must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end." Webb v. Goord, 340 F.3d 105, 110 (2d Cir. 2003).

Plaintiff has offered no admissible evidence of any agreement between any state actors, and instead relies upon conclusory allegations that defendants acted in concert with each other to deprive him of his constitutional rights.  Such conclusory allegations are insufficient to withstand summary judgment and, therefore, any conspiracy claim asserted in the Complaint is dismissed. See Webb, 340 F.3d at 111 ("The plaintiffs have not alleged, except in the most conclusory fashion, that any such meeting of the minds occurred among any or all of the defendants. Their conspiracy allegation must therefore fail.")(citing Boddie v. Schnieder, 105 F.3d 857, 862 (2d Cir. 1997)(dismissal of "conclusory, vague or general allegations of conspiracy to deprive a person of constitutional rights" is proper)); Lashley v. Wakefield, 2005 WL 1006309, at *11 (W.D.N.Y. May 2, 2005)(granting summary judgment on Section 1983 conspiracy claim where plaintiff

proffered no evidence of a conspiracy and relied instead on unsupported conclusory allegations)(citing <u>Ciambriello v. County of Nassau</u>, 292 F.3d 307, 325 (2d Cir. 2002)("conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed.")).

### C. Failure to Train and Supervise Claim

Finally, to hold a municipality liable as a "person" under § 1983, Plaintiffs must show that a policy or practice of that entity caused the deprivation of their federal rights. <u>Monell v. Dep't of Soc. Servs.</u>, 436 U.S. 658, 690-91 (1978).  Because Plaintiff has failed to establish that his constitutional rights were violated by any of the individual defendants' actions, the failure to train or supervise claims against the City, the Police Department, and Chief Piche in his official capacity are dismissed. <u>See</u> <u>City of Los Angeles v. Heller</u>, 475 U.S. 796, 799 (1986)(*per curiam*)("[T]his was an action for damages, and neither <u>Monell</u>[], nor any other of our cases authorizes the award of damages against a municipal corporation based on the actions of one of its officers when in fact the jury has concluded that the officer inflicted no constitutional harm."); <u>Smith</u>, 175 F.3d at 107 (summary judgment properly granted to municipality where Court held that plaintiff had suffered no constitutional violation because officer had probable cause to arrest); <u>Mura</u>, 2005 WL 615754, at *5 ("Given [the

31

Court's] determination that there was ample probable cause for plaintiff's arrest, there is no basis for finding that the Sheriff's Department implemented faulty policies."); see also VonRitter  v. Town of Bethel, Ct., 1993 WL 83291, at *9 (N.D.N.Y. March 15, 1993)(considering the county as the real party in interest on a Monell claim against a county's sheriff's department)(McAvoy, C.J.); Mathies v. Fries, 121 F.3d 808, 818 (2d Cir. 1997)("A claim against a government officer in his official capacity is, and should be treated as, a claim against the entity that employs the officer.")(citing Kentucky v. Graham, 473 U.S. 159, 165-66 (1985)); Riley v. Town of Bethlehem, 44 F. Supp.2d 451, 465 (N.D.N.Y. 1999)("It is apodictic that claims against an individual in his official capacity are to be treated as claims against the municipality.").

**V.   CONCLUSION**

For the reasons set forth above, defendants' motions for summary judgment [dkt. # 47 & # 49] are **GRANTED**, and the action is **DISMISSED IN ITS ENTIRETY**.

**IT IS SO ORDERED**

Dated:May 25,2005

Thomas J. McAvoy
Senior, U.S. District Judge

32